USCA1 Opinion

 

 September 23, 1993 [NOT FOR PUBLICATION] UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-2467 RAYMOND E. CRONKITE and MAINE AQUARIUM, INC., Plaintiffs, Appellants, v. FEDERAL DEPOSIT INSURANCE CORPORATION, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Gene Carter, U.S. District Judge] ___________________ ____________________ Before Selya, Cyr, and Boudin, Circuit Judges. ______________ ____________________ Valeriano Diviacchi with whom Diviacchi Law Office was on brief ___________________ _____________________ for appellants. Claire L. McGuire, Counsel, Federal Deposit Insurance _____________________ Corporation, with whom Ann S. DuRoss, Assistant General Counsel, _______________ Federal Deposit Insurance Corporation, Colleen B. Bombardier, Senior _____________________ Counsel, Federal Deposit Insurance Corporation, and Robert ______ McGillicuddy, Deputy Senior Counsel, Federal Deposit Insurance ____________ Corporation, were on brief for appellee, Federal Deposit Insurance Corporation. John J. Wall, III with whom Thomas F. Monaghan and Monaghan, ___________________ ___________________ _________ Leahy, Hochadel & Libby were on brief for appellee, Archie Maxwell. _____ _________________ ____________________ ____________________ BOUDIN, Circuit Judge. Raymond Cronkite purchased 46 _____________ acres of land in 1982, giving the seller a note on which Cronkite later defaulted. In April 1985, the then holder of the note, Maine National Bank, entered into a settlement agreement with Cronkite, who agreed to a revised payment schedule for the 1982 note and gave the bank a blanket mortgage on all his property in York County, Maine. The agreement also included a paragraph obligating the bank at Cronkite's request to "release parcels" from the blanket mortgage, provided that Cronkite met four conditions: --that he not be in default under the agreement; --that he not be in default as to his existing payment obligations to the bank; --that he show the bank a net worth of over 150 percent of the remaining principal and accrued interest on the note; and --that he seek the release in order "to complete a fair market value sale" and provide the bank with a copy of the contract showing the sales price and a with a good faith estimate of the distribution of the sales proceeds. In December 1985, Cronkite arranged to sell a parcel of property that he owned ("lot 8") which was not subject to Maine National Bank's blanket mortgage. Lot 8, however, was subject to a mortgage held by the Saco and Biddeford Savings Bank ("the Saco Bank"). To obtain release of that mortgage, Cronkite proposed that Maine National Bank subordinate its interest in lot 136, which was subject to the blanket mortgage, to the interest of the Saco Bank. The Saco Bank -2- -2- was willing to release its mortgage on lot 8 if Maine National Bank would allow lot 136 to be substituted as collateral for Cronkite's debt to the Saco Bank. Although what happened next is the subject of some dispute, ultimately Maine National Bank declined to subordinate its interest in lot 136, taking the position that it had agreed to release parcels under certain conditions but not to subordinate its interest. Thereafter the Federal Deposit Insurance Corporation ("FDIC") became the receiver of Maine National Bank. After exhausting the required administrative remedies, Cronkite brought the present suit in the district court against the FDIC for breach of the settlement agreement based on Maine National Bank's failure to subordinate its interest in lot 136.1 The magistrate judge granted summary judgment for the FDIC, ruling that the settlement agreement on its face required the bank to release property but not to subordinate it. The district court adopted the magistrate judge's recommended decision. This appeal followed. Cronkite's main argument is that since "subordination" is a lesser sacrifice of interest than a full "release," the latter term ____________________ 1Cronkite joined as plaintiff a corporation that he hoped to assist through the sale of lot 8 and named as defendants two former officers of Maine National Bank. He also made other claims in addition to breach of contract. Since the presence of other parties does not affect the legal issue, and the other claims have not been briefed on appeal, we need not discuss the other parties or other claims. -3- -3- encompasses the former and the settlement agreement should be read as if it said "release or subordinate." At the very least, Cronkite says that he should have been allowed to offer extrinsic evidence. Considering the issue of interpretation de novo, In re ________ _____ SPM Mfg. Corp, 984 F.2d 1305, 1311 (1st Cir. 1993), we agree _____________ with the magistrate judge's reading. It is sound policy to read commercial documents according to their terms. Subordination may often have less severe consequences for the holder of an interest than does release, but it is still a different legal arrangement. And agreements relating to loans and mortgages are instruments in which words are normally used with some precision. If one begins by departing from the plain meaning of a familiar term one may end by enlarging the contract to embrace transactions never contemplated. This case well illustrates these precepts of construction. The transaction that Cronkite seeks to bring within the "release" paragraph of the settlement agreement is by no means the same as the type to which the paragraph is directed. In the former case, the bank would know not only that Cronkite was current in his obligations to the bank and had a net worth of 150 percent of his remaining obligations, but also that he was selling the released property in "a fair market value sale." In other words, his secured real -4- -4- property would be diminished but he would increase his immediate net worth by the fair market value of the property, giving the bank some additional protection. In the subordination transaction proposed to Maine National Bank, Cronkite was asking the bank to subordinate its interest not so that the subordinated property could be sold but so that some other piece of property could be sold. There is nothing in this arrangement to assure that the sale price of the property sold would be as high as the value of the property with respect to which Maine National Bank was to subordinate its interest. That bank could easily find that it had given another creditor a superior position on a very valuable piece of property so that Cronkite could make a sale of a much less valuable one. It does not matter whether this was or was not the case here. The point is, rather, that the transaction is in no sense the one to which the bank had committed itself. Under certain circumstances, extrinsic evidence may be admissible to cast light on the intention of the parties and the meaning of their agreement. For the sake of completeness, we note that Cronkite did not in opposing summary disposition point to any extrinsic evidence that would alter the result even if extrinsic evidence were admissible. Accordingly, we have no occasion to consider -5- -5- when under Maine law extrinsic evidence is admissible in interpreting written contracts. Affirmed. ________ -6- -6-